The next case is number 2012-5129, DISTRIBUTED SOLUTIONS, INC. v. United States. Mr. Coulter, when you're ready. Thank you, Your Honors. May it please the Court. My name is Tom Coulter, representing DISTRIBUTED SOLUTIONS, INC. Your Honors, what we believe is important in this case is for you to look at, as you've seen from the record, this has been an arduous process for my client. What we'd ask is that you examine that process as part of determining whether the conduct by the Department of Labor was arbitrary and capricious. And we think if you examine that conduct, you will quickly see that it in fact was. First of all, as we pointed out in our briefs, the evaluation criteria that was set forth in the amended RFQ was not the basis upon which DSI, DISTRIBUTED SOLUTIONS, INC., was judged in this case. Originally, there were 12 factors listed. Those were the factors that everyone knew would be the focus of the evaluation. Yes, but when they amended them, you had opportunity to respond, didn't you? We did, Your Honor. In the final proposal revision, we certainly did. And in that case, and it's an excellent point— No due process problem there, is there? There is, in the sense of discussions, and that's another point that we wanted to talk about. Your Honor, we certainly were, at that point, given an opportunity to revise. In this case, there were discussions held. They were not required, but the government reserved the right to hold discussions, and did in fact hold discussions. As contractors understand, they're there to point out major deficiencies in the proposal. It's so that you can present to the government the best proposal that you can, so they can make a best value determination. And when there are obvious weaknesses in it, the government is supposed to tell you so that you can make whatever necessary corrections there are. In this case, the two factors that we're talking about here, change management and business process re-engineering, were not mentioned to DSI at all. Nor, in fact, was perhaps the more significant omission by DSI, it appears, the lack of comments to support their laundry list of functionalities with regard to sub-factor A of the technical quote. This was worth half of the technical quote, which was the most important factor. And in the case, DSI responded in a way that it believed provided the necessary comments through a list of designated template, what's been called template responses, or responses that were listed in the RFQ itself. Are you talking about FAR 15 now, in terms of discussing with you the weaknesses and so forth? I mean, is that the requirement that you're resting on for purposes of your argument? FAR 15-306, Your Honor, clearly this was a FAR Part 8 procurement. But FAR 15-306, we believe, does provide the proper guidance, and both the Court of Federal Claims and the GAO have looked to it in cases of FAR Part 8 procurements for guidance as to whether or not discussions were meaningful, and in essence, were they fair. And so, whether the standard is 15-306 or it's the fairness standard of 102 in the FAR, in either event, in this case, they weren't fair in the sense that they didn't alert DSI to what the government later found were major deficiencies. But you're not arguing that the conversations converted this into a negotiated contract, are you, a Part 15 contract? No, Your Honor. This was clearly a FAR Part 8 procurement. But, as the cases indicate, when there are elements of FAR Part 15 utilized by the government, there must be some standard by which they are to be judged. And courts and GAO have looked to 15-306 for guidance. Well, the problem I have with that flexibility, and I want to be careful here because I can't recall at this particular juncture what's confidential and what's not. But it seems to me, I mean, those provisions deal with a substantial weakness in the proposal, a substantial deficiency that is tied to performance at an unacceptable level. Right. Here, your client did just fine. It was a relative choice between two people who had pretty good assessment with respect to all the criteria. So even if it applies, I'm having a hard time understanding how it applies to this case to demonstrate that the government acted arbitrarily. Understood, Your Honor. And in this case... Respond to that. I mean, presumably you think I'm wrong. Yes, Your Honor. I do believe that is incorrect. And the reason is that 15-306 does address buzzword terms of significant weaknesses and deficiencies. But it also talks about contracting officers being encouraged to discuss other areas where proposals could be improved. And the goal, again, is to maximize the government's ability to obtain the best value. So they want to make sure that there's not some major misunderstanding so that they can assess the relative merits without some major problem with it. Now, in this case, I will grant you that in the revised evaluation, the word significant mysteriously disappeared. It was there many times in the original evaluation, but they're all gone in the revised evaluation. But nevertheless, the government cited both to the lack of comments and to the lack of discussion of change management and business process reengineering as fundamental problems with DSI's proposal. And in fact, in the award decision, the contracting officer, the source selection authority in this case, cited to the same reasons for risk involved in using DSI's system. In fact, the technical evaluation account report said, we're not sure if their system does what it says it does because they didn't provide any comments explaining what it does. And they assigned it moderate risk. These are the bases of the decision that was ultimately made to choose between DSI and CompuSearch. Now, those are discussion points that clearly could have been raised and should have been raised. One of the best examples of that, if we look to the lower court's opinion below, the lower court cited the case of ACS Government Solutions Group, which is a GAO decision from 2011. I'm sorry, from 1999. ACS Government Solutions Group, Inc. And the lower court cited it to say, in that case, discussions were contemplated and were held. And therefore, because the discussions were not specifically called for here, he uses that case to distinguish between our situation and ACS Government Solutions. In ACS Government Solutions, they held that there were several points that the technical evaluation panel cited as deficiencies or as weaknesses in the proposal. And the source selection authority cited the same weaknesses. And its conclusion was that the discussions were not meaningful because you didn't give the protester a chance to respond to what you obviously found to be significant problems with the proposal. Here, they can say it's not a significant weakness, whatever they want. We were rated, the lowest rating we received was in sub-factor A, which is worth half of the technical quote. And that was all due to the lack of comments in the government's mind that we failed to provide. Now, first of all, we don't believe that's appropriate in terms of what the language of the RFQ actually required, because we did provide what it required. But nevertheless, the government found that that was our significant problem, was we didn't provide any comments. So they don't know whether our system can do what it says it does. So what is your point? I was going to ask you, you make it sound like, let me understand a little bit of the background. Yes, Your Honor. You are not strangers to this agency. In fact, you've been serving this agency for some period of time, your client. More than 10 years. More than 10 years. Providing essentially similar type services. Yes, Your Honor. And has that relationship, as far as you know, been satisfactory? As far as my client knows, they have never received any negative performance review, negative performance evaluation, no past performance problems until in this case. So the people you were dealing with in all of this process were not strangers to you? I think that is generally the case. Generally. Yes, I think some of the people they knew and some of them perhaps they didn't. Apparently brought in some other people. That's right. So it's a little puzzling to me, in part because you all had an established contractual business relationship. Why in these conversations you all didn't get everything that you wanted to get? Or they didn't get everything they wanted to get. It's a puzzling process and it's a rather detailed and convoluted process. And yet you were there on the ground, your client was there on the ground the whole time. Is there something more in this case than we are understanding? Your Honor, obviously we believe there is. The law is difficult in this area in terms of bias, but I think my client readily conceded it was pretty clear to them that the decision was made at the front end to go move to a CompuSearch system, which is a system used in many, many agencies. It's a large company, I understand that. Is yours a large company? No, Your Honor, it's a small business. You're a small business located in? Actually in Reston. Reston. Yes, Your Honor. And we've served many other agencies. We've served DOL for over 10 years. I don't think anyone would argue that they've underspent because they couldn't use our procurement system properly. We've never been alerted to any problems with it. I think what happened here is there was a decision made to go with a more, I think, mainstream was the term used in the market research report. That market research report essentially dictated what happened at the end. They said we were, DSI was in danger of some obsolescence. There's no evidence of that in the record, but that was a statement made. So it's frustrating to my client as well. We just like to be given a fair chance. I think at every turn we feel like whether it's sub-factor A or it's the lack of discussions to alert us to what you clearly thought was a major problem. We didn't have any comments for any of the hundreds of functionalities of our system. If they had told us that, it's an easy fix. We put the comments in there and they make a decision straight up as to whether one system is better than the other, but we weren't afforded that chance. It's hard to somehow to conform that with now they say the software was not user friendly and that they didn't get the help that they needed and asked for. All of this is a surprise, these critical comments that are now in the record? They are actually, Your Honor. There was nothing ever made. We've been there ten years and had never had any criticism of the usability of our system. Not one. There's no record evidence of any notice to us. Hey, your system isn't doing some function that we need. It's delaying. It's in danger of crashing. Nothing. There is not one thing in the record to that. And I see I'm well into my rebuttal time, so I'd like to save a little for the... Okay. Let's just save your rebuttal time and we'll hear from Mr. Kim. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. As Your Honors have already acknowledged, there are several things that I want to go ahead and respond to directly with regard to DSI's arguments. First off, as Your Honors have recognized, this is not a Part IV or Part XV procurement. And what's important to note is that not only is this not Part XV and it's explicitly in the RFQ, and as DSI can see, it's a Part VIII procurement. There's nothing in the record or anywhere in the RFQ or anywhere else suggesting that the agency ever intended to insert or incorporate Part XV requirements. Mr. Kim, let's get right to the heart of this case. A lot of technical talk about did they change this, did they do this, did they do that. Is it the government's position that it should be free to change contractors if it chooses to for this kind of a provision or this kind of a service? Well, it's free so long as it goes through the proper channels and proper mechanisms of proposals, whether you have negotiations or not or discussions or not. But so long as you're going through the proper hoops and the proper channels and afford each offeror who wants to submit a proposal the proper opportunities, then yes. So your view would be even if the government had decided up front that their contract, I take it, was either expiring or you were going to do a different kind of thing, it's your view that even if the responsible government officials had said to themselves, let's get this other company in here, as long as you go through the proper hoops and make the proper record, you're free to do that. Is that your view? Well, certainly the agency cannot just as a facade make a – what's the right word I'm trying to think of – present something that has no actual meat or no factual meaning, but if it goes – if it affords the proper opportunities and the proper analysis of all the offeror's proposals, then at the end of the day if the government decides that the best – in this case best value judgment – the best value judgment is with a different offeror, then yes, the government's free to do that. This case, I have to tell you, has a certain sniff about it that makes it questionable – not questionable, but it's pretty clear that the agency wanted to move on to a different company, and when it looked like the two submissions were too close, they were obviously the low bidder. The agency kept changing the criteria a little bit, tweaking it here and there in order to make sure that they could get the bid that they wanted. I take it your view is as long as those are legitimate criteria and it's done in a reasonably even-handed way, it's okay. Well, I respectfully take slight issue with your honest characterization if only because there's not – it's not as if there was tinkering along the way. There was an amended RFQ, and that has been locked in, and that's the starting point for this entire evaluation process. Yes, there was an initial evaluation by the technical evaluation panel, and as DSI raised in several protests and then the agency acknowledged later on, there was a mistake in the evaluation process and there was concerns about other potential mistakes, so there was a reevaluation. But in terms of the basis, the foundation that we're working off of, the evaluation criteria, the required elements, if you will, that is in the 2011 – or, excuse me, the December 2010 amended RFQ, and that has not changed from day one, and so that's your starting point. And so any notion of, well, you have to compare it across the original RFQ and see how evaluation factors may have changed or criteria may have changed, that's not what's going on here. What's going on here is that there was a corrective action that was put in place because there was potentially some errors in the evaluation process but against the amended RFQ, and so there was a reevaluation done against the same amended RFQ. Can I just ask two points? Firstly, I just want to be clear. No one terminated the DSI contract. This case is about a new proposal for a new system. Yes, that's correct. Okay, I just want to be clear. And you've touched on this a little. I guess the thing that kind of rubbed me as kind of questionable was this decision to re-evaluate on all of the factors as opposed to just the new factors that were changed, and DOL stated a rationale for doing that. I mean, part of the results here are based on the fact that the sides were re-evaluated on the old factors as well as the new factors, and there was some bump-up, at least for the person who ultimately got the contract. And I guess certainly I'm not concluding that that necessarily rises to a level of arbitrary depreciation, but can you explain why that was necessary? Well, I guess the more provident question is not whether it was necessary but whether it was reasonable because there's multiple things going on. But I see where your honors question goes to. The one error that's kind of most straightforward is that the agency recognized was that there were the change management and business process re-engineering elements that were deemed to be evaluation factors that were on par with the other explicit factors, and that was incorrect. And then on top of that there was another element, surveillance plan, that had been omitted from the consideration. So there were multiple problems there. But on top of that, there was a concern or an issue raised by DSI in one of its prior protests that challenged whether the agency had properly applied its evaluation scheme. You know, its very good or excellent ratings, the definitions that it had set forth for those ratings to the different assessments of each offeror. And DSI in its protests raised several examples of that. But the agency, as a result of that protest, of that particular issue, the agency in its judgment said, well, rather than sit there trying to figure out which of the elements the technical evaluation panel may have said, oh, well, we properly applied the very good standard for this element, but we didn't do it for that one. But we did do it for this one and not that one. Rather than go through that individual process, the agency said, well, let's just go ahead and just redo the entire evaluation. And this time, let's, you know, here are the standards and let's make sure we do it right for all the offers. And why didn't someone just go back to them and say, hey, you neglected to give us these comments. Why don't you fill in the blanks with respect to these comments? Well, as Your Honor mentioned earlier, this was not a significant weakness or deficiency. This was something that, in fact… It's a little weakness. Yes, it's not a significant weakness, to use the Part 15 parlance. What does that mean? You know, we've got the numbers and we've got the ratings. If, in fact, you could come forward and demonstrate that I could have changed my rating so much so that it may have even been outcome determinative, is that what makes it significant? No, Your Honor. Well, what makes it a significant weakness other than the fact that it results in you not getting the contract? Well, it goes towards the risk that the offeror does not understand the requirements. It goes towards the risk that the offeror can't, in fact, do what it says it can do. And to both those points, the agency determined that notwithstanding the lack of these comments, that actually DSI received a good or not unfavorable rating with regard to that point. Perhaps if they had given an opportunity to submit comments, they would have gotten a higher rating and might have ultimately changed the results of this hearing. Well, it's possible that they could have gotten a slightly different rating, Your Honor, but the requirement is not for the agency to go back and tell the offerors, well, here's where we think you can improve on every little point, or here's where we think you might be relatively weaker relative to CompuSearch or the other offerors. The standard, the legal standard for discussions deals with, deals more with, do you understand, does the offeror understand the requirements of the contract? Isn't there another, the question really, the following on all this, you try to understand where the small business preference fits. If, in fact, this small business doubled its bid to match that which was accepted by DOL, they may very well have been able to provide the help desk service and a lot of the other things for which they were criticized. And in trying to understand when you try and implement, I haven't heard you say anything about where the small business preference fits in this evaluation, except when you look, if their bid was half that of the bid that was accepted, perhaps they were indeed providing fewer services in order to keep the cost down and all the rest of it. If you're telling us that there's no room for negotiation under any circumstance, and I'm just wondering whether, in fact, the fact that this is a small business affects that negotiation at all, because it does look as if the areas in which there was a less than excellent or less than very good evaluation was one which was service intensive. And perhaps this is a service business, the bid is half the amount, and so here we have a conclusion that, yes, we get better service from a successful bidder, and we're willing to pay twice as much for it. There seems to be an intellectual gap that I'd like your help in understanding. Well, the agency did talk through the fact that, yes, CSI obviously presented the proposal that was half as much. And that's the whole point of the best value analysis, is to figure out, well, is the lower price worth what you might not get with a higher priced offer, or vice versa, is the higher price worth the extra benefits that you would get? The agency, in the contracting officer's decision, specifically delineated all the reasons why she believed that that was in fact the case, and that, yes, CompuSearch would entail a higher priced offer, but for all the reasons that she stated, that was what she saw as a differentiation. This is the gap, isn't it? Had this small business somehow understood, perhaps they did, that they could in fact go from $10 to $20 million and still have a competitive bid, perhaps they could very well, and also in providing the services in which they were rated as less than perfect, that there were adjustments that could be made, and it does look as if this is quite a rigid situation, perhaps. This is what the government needs in its competitive bids. I appreciate there were bidders besides these two, but in terms of understanding why this bidder was deficient at half the price, it does look as if there are reasons that could have been remedied with interaction. I can see that discussions might have engendered some of those types of things that your Honor is talking about, but the fact remains that for purposes of this case, and the propriety and the reasonableness of this procurement, the agency took the actions that it did, and it decided that those higher prices were worth it because of the additional benefits. So yes, it's possible that had DSI been able to have more money or put more money toward this, they might have been able to provide these services, but the reality is that their proposal was what their proposal was, and at the end of the day, the agency decided that for the reasons they stated in the contracting officer's award decision, that was the way that they would go. Yes, just in thinking of this, I have no trouble with the process except for the fact that this was a small business, and trying to understand where all of the statutory requirements for preference to a small business, and how that fits into this particular procurement. Well, I see that my time is running out, but the small business issue was one that was addressed and fully dealt with prior to the proposals being set forth. So the agency decided that that would not be a factor, and they would simply... Can the agency do that? All the preferences are statutory. Well, they can do that so long as they afford the offerors the proper equal footing moving forward. So as far as we know, we've had a number of cases and they're brought by small businesses, but typically those, when I've seen small business cases involving small business, there's a no-bid contract with respect to, at least some of the statutory requirements with respect to small businesses allow for no-bid contracts. Are there particular provisions that you're aware of that would apply to the small business entity competing in this context? One moment, Ron. All I can reflect is that that was an issue that was dealt with in the pre-protest stage and addressed at that point. So moving forward, that was something that... Is compliance with the small business statutes the obligation of the government, or is it the small business' obligation to come forward and sue on that issue? Well, it's certainly the government's obligation to comply with it, regardless of whether or not... And nothing in this record raises that issue. Yeah, I think that's the more to-the-point characterization, that nothing in the record implicates that there's a concern over small business... Well, it's inaccurate, is it? Because they certainly make a point that they're a small business. Well, the fact is that they are a small business, yes, but certainly they don't raise an argument that the RFQ is deficient or erroneous or contravenes law because of that fact. I mean, that actual issue is not before this Court. So yes, I mean, the fact is that they're a small business, but then that plays into the technical benefits that they can provide and the cost may be lower that they can provide, but then that all goes against the best value adjustment. But as to whether or not their simple status as a small business plays any part of this on its per se, that issue is not before this Court. Okay, any more questions? Thank you, Your Honor. Okay, thank you, Mr. King. Don't you wish you'd reserved some time for the other company? All right, Mr. Coulter. Mr. Coulter, let me, I don't want to occupy your rebuttal time, but let me just be quick, let me quickly tell you what my problem is with the posture of your case. Yes, Your Honor. Putting aside the small business issue, which I think is a very significant, perhaps, issue in this, although it's not raised directly other than that you're a small business, I think you've done all you could with the procurement law. But here's the problem. The government wrote that law, and they know how to work it, and the agency has staffs of people who do it all the time. And they went through this process, and they had a goal in mind, and your client wasn't part of it, apparently, or perhaps was, who knows. And you brought your case to the Court of Federal Claims, and in a 27-page, well-written opinion by Judge Miller, he goes through all the requirements, and he finds that they've all ultimately been met. This court is a court of errors. We don't make them, we correct them. Other than the fact that Judge Miller held against you, what error did he make? And I have trouble finding any specific error that would be sufficient for us to tell the government, you've got to go back and tidy up your homework. Excellent point. You're clear that they know where they're going with this procurement, right? I think it is evident from the long record of this process. It's evident. I mean, come on, let's just all talk like real people. It is clear from day one they wanted to move to CompuSearch's process. And according to Judge Miller, they went through the administrative record, eventually got it all straight. What more can we do for you? And if they move to CompuSearch and they give us a fair process, we're not here. But what Judge Miller failed to recognize, a couple of things. The fundamental point of, you have to tell bidders what the evaluation criteria are that you're going to use. They did eventually. They told us what they were. They went through an amendment process to take two of them out and said, Don't bother with those. You've got a page limit you're going to have to deal with. Don't bother with those. So we focus on the other elements. We get to GAO and they say, you're right, you got us. We added these two elements in and we shouldn't have done that. In fact, it's so egregious, we're going to take corrective action because we shouldn't be considering these factors. And then what do they do? They consider the factors again. They slip them under project management and use the exact same analysis. And Judge Miller says, well that's okay because they were part of project analysis. Yes, but so were four other specific evaluation factors set out separately for evaluation. Clearly there was a plan here to look at those separately aside from project management. You can't just slip the two that you want to use back in under project management. The biggest issue is the discussion point because it doesn't depend on whether it affected the tradeoff or competitive prejudice. If we weren't given fair discussions, it's a ground for reversal. And here we weren't given fair discussions. They knew that we were lacking in these two elements. They specifically struck out a question asking about business process reengineering when they engaged in discussions with us. They said, oh no, never mind, you don't need to address that. And then we're criticized for it. But the biggest one are the lack of factors, the lack of comments in subfactor A, which first of all we don't think is appropriate because of the way the template response has satisfied the requirement. But if DOL disagreed, they had to tell us. Those are hundreds of functionalities and they can't tell whether our product does anything that it says it does. How can they fairly evaluate us on that point? Thank you, Your Honor. Thank you, Mr. Colvin. Mr. Kim, please be second in your submission.